UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                    :
TERREL SYKES,                                       :
                                                    :
                              Plaintiff,            :
                                                    :            22 Civ. 3989 (JPC)
              -v-                                   :
                                                    :            OPINION AND ORDER
                                                    :
LISA RACHMUTH *et al.*,                             :
                                                    :
                              Defendant.            :
                                                    :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       Plaintiff Terrel Sykes brings this action against his former employer, Cornell University,

and his former supervisor, Lisa Rachmuth, alleging race discrimination and a hostile work

environment under 42 U.S.C. § 1981, as well as various forms of discrimination and retaliation

under the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and

the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL").

Defendants have moved to dismiss.  Because Sykes has failed to sufficiently allege an adverse

employment action or a hostile work environment on the basis of his race under section 1981, the

Court grants the motion with respect to that claim.  Having dismissed Sykes's only federal claim,

the Court declines to exercise supplemental jurisdiction over the remaining state law claims and

dismisses those claims without prejudice.  The dismissal of Sykes's federal claim is without

prejudice to his bringing a Third Amended Complaint in the event he can remedy the pleading

deficiencies addressed herein.

## I.  Background

A.    **Facts**[1]

Sykes, "a gay Black male," previously worked for Cornell University at the New York City Elder Abuse Center (the "Center").[2]  Second Am. Compl. ¶¶ 10, 14.  Rachmuth was the Deputy Director and later Executive Director of the Center.  *Id.* ¶ 16.  Defendants "interviewed and hired Mr. Sykes" for the position of administrative assistant on November 5, 2018, after which he reported directly to Rachmuth.  *Id.* ¶¶ 18-19.

Sykes's allegations begin in the summer of 2019 when, at his doctor's recommendation, he decided to "undergo gastric sleeve weight loss surgery to combat his sleep apnea."  *Id.* ¶ 24.  At a weekly work meeting, Sykes informed Rachmuth he would need to take two weeks of medical leave for this procedure.  *Id.* ¶ 25.  Rachmuth "responded to [Sykes's] request for an accommodation by questioning his need for the surgery, and then by threatening that [Sykes's] future role in the organization might be impacted by his decision to undergo the surgery that his doctor had recommended."  *Id.* ¶ 26.  Specifically, Rachmuth told Sykes that she would "need to hire a temp to replace [him], it could be temporary or permanent, we'll see."  *Id.* ¶ 27.  Rachmuth also "insisted that [Sykes] explain to his colleagues why he would be out for two weeks" which

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Second Amended Complaint.  Dkt. 25 ("Second Am. Compl."); *see also Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor").

For the avoidance of doubt, the Court notes explicitly that the claims made about the conduct of Lisa Rachmuth and Abigail Nathanson, including any comments they made in the workplace, are not facts found to be true by the Court.  They are only allegations made by Sykes and are merely assumed to be true for purposes of this Opinion and Order.

[2] According to the Second Amended Complaint, the Center "is a project of Weill Cornell Medical College" located in New York County.  Second Am. Compl. ¶ 13.

Sykes felt was an invasion of his privacy and was reluctant to do.  *Id.* ¶¶ 28-29.  Sykes eventually

did disclose to his co-workers that he would be out for gastric bypass surgery.  *Id.* ¶ 29.  Upon

Sykes's return to work, Rachmuth told him that he would be "keeping his job" and "would openly

make comments about [Sykes's] visible weight loss, such as 'skinny minnie' and 'you're getting

so skinny you're disappearing.'"  *Id.* ¶¶ 30-31.

Sykes's next set of allegations begins in January 2020, when Defendants hired Abigail

Nathanson as a "Senior Case Consultant Coordinator," a position senior to Sykes's.  *Id.* ¶¶ 33-34.

Rachmuth "genuinely liked Nathanson and it was obvious to [Sykes] that Nathanson had become

one of Rachmuth's favorites."  *Id.* ¶ 34.  Soon after starting at the Center, "Nathanson began to

make inappropriate comments" to Sykes including "you look good in comparison to your website

photos" and "you need new clothes to show off your hot new figure."  *Id.* ¶ 35 (emphases omitted).

Nathanson would also "pressure [Sykes] to allow her to take photos of him and would ask him out

to dinner."  *Id.*  In order "to put an end to Nathanson's unprofessional conduct," Sykes informed

her that he is gay.  *Id.* ¶ 36.  After learning this information, Sykes claims that "Nathanson began

making inappropriate comments about [his] sexual orientation and race," to include:

> (i) repeatedly referring to [Sykes] as a "Gold Star Gay" and ridiculing him for
> having[] "never touched vagina"[;] (ii) making inappropriate sexual and racially
> charged jokes by comparing the size of [Sykes's] genitals to that of an Asian co-
> worker; (iii) inappropriately asking if the photos of men [Sykes] had framed on his
> office desk were, in fact, "photos of guys that [Sykes] would like to ride"; and (iv)
> discouraging [Sykes] from pursuing a Master's degree by stating that "someone
> like you (referring to [Sykes]) should get a certificate instead."

*Id.* ¶ 37 (emphases omitted).  Sykes did not immediately report this behavior, because he felt that

Nathanson and Rachmuth had a "close working relationship" and because Rachmuth "had

repeatedly made it known to him that she had 'good friends in HR.'"  *Id.* ¶ 38.

Later in 2020, Cornell established an Office of Institutional Equity ("OIE"), whose "professed purpose" was to "seriously handle complaints of discrimination." *Id.* ¶ 39. Sykes then reported Nathanson's comments to Rachmuth and human resources and "asked that his complaint be investigated by OIE." *Id.* ¶ 40. In August 2020, Sykes also relayed Nathanson's behavior to an OIE investigator, who then interviewed Nathanson. *Id.* ¶¶ 41-42. Sykes contends that Nathanson admitted Sykes's complaints and then was fired on August 26, 2020. *Id.* ¶¶ 42-43. After learning of Nathanson's conduct, Rachmuth's "attitude towards [Sykes] chilled." *Id.* ¶ 46.

Sykes also alleges a course of conduct by Rachmuth that appeared to occur after her promotion to Executive Director in January 2021. *Id.* ¶¶ 47-55. Rachmuth once "reorganized a reporting structure so that a Caucasian employee would not report to a Black employee" who had been hired to replace Nathanson. *Id.* ¶¶ 49-50. Rachmuth "would openly scrutinize the behavior of her Black subordinates while being more lenient towards Caucasian staff," in particular by being "openly critical" of a black employee who was unable to "present new elder abuse cases at Enhanced Multidisciplinary Team . . . meetings," but not being critical when a white employee "would also fail to do the same." *Id.* ¶ 51. Rachmuth "would also make inappropriate remarks about the ethnic features of staff, such as advising a Black employee on how to keep her hair from getting kinky." *Id.* ¶ 52. According to Sykes, Rachmuth also attempted "to sabotage the efforts of employee resource groups, designed to create more diversity and equity at the" Center. *Id.* ¶ 53. This included Rachmuth trying to "terminate" the Center's Racial Equity and Justice Task Force, of which Sykes was a part, because it was "excessive" following Weill Cornell's creation of its own task force and feeling that the Center's task force should be "rolled into the Weill Cornell Medicine equity program." *Id.* ¶ 54. After her efforts to disband the Center's task force failed, Rachmuth "placed excessive responsibilities on the program that were not placed on other

employee groups" such as requiring "members of the program to lead discussions on race and equity, as well as conduct presentations on the group's accomplishments on race and equity to determine the viability and necessity of the program." *Id.* ¶ 55.

Sykes also brings allegations of pay disparity.  He maintains that he was compensated "at a lower rate for performing substantially the same work as non-Black employees." *Id.* ¶ 56. Sykes's role as an administrative assistant, "was a grade four (4) position." *Id.* ¶ 57.  But "Rachmuth directed [Sykes] to perform the role of a data analyst, which was a grade six (6) position." *Id.* ¶ 58.  (Presumably, Sykes's references to "grades" are to pay grades.)  In October 2020, Sykes "complained to Rachmuth that although his title and pay was that of an administrative assistant, he had been doing the work of a data analyst for the majority of his tenure." *Id.* ¶ 59. Rachmuth "initially responded by saying she really could not do anything about [Sykes's] concerns, and suggested that he look for a role in another department" before connecting Sykes with a human resources recruiter.  *Id.* ¶ 60.  That individual then "coordinated an interview for [Sykes], for a role in another department that was not a good fit and which [Sykes] had openly expressed he had no interest in pursuing." *Id.* ¶ 61.

Shortly after Sykes elevated his pay concerns to someone else in human resources in early 2021, a "grade five (5) Data Specialist role was created for [Sykes]" who was then told to negotiate his new salary with human resources. *Id.* ¶ 63.  While Sykes was "frustrated with being offered a grade five (5) position, which was still a grade lower than the work he performed," he agreed and requested a salary of $60,000. *Id.* ¶ 64.  This increase was denied by human resources, citing the Center's policy of not permitting a pay increase of more than fifteen percent, but instead Sykes received a salary increase to $57,000 retroactive as of January 2021. *Id.* ¶¶ 65-66.  Sykes accepted this offer "in part, because Rachmuth made it clear" that "his former role would be eliminated."

*Id.* ¶ 68.  Sykes then learned that an Asian co-worker, Phillip Kim, was "given an increase of more than 15% in annual compensation, after being transferred to a new role." *Id.* ¶ 69.

Following Sykes's "complaints of pay inequity, Rachmuth's behavior towards [him] deteriorated" in that "Rachmuth[] grew visibly colder, cancelled their weekly meetings, and began to curtail some of [Sykes's] responsibilities." *Id.* ¶ 70.  Rachmuth also "forced a discussion about the rise in Asian[] hate crimes as a result of the pandemic and accused Mr. Sykes and Francesca Kabemba," whom Sykes describes as biracial, "of being uninterested in the topic." *Id.* ¶ 72.  Kabemba "openly objected to Rachmuth's accusation," leading Rachmuth to remark to another employee, "I can't believe Francesca said that.  Do you think she is hanging out with Terrel?" *Id.* ¶ 72.

On May 1, 2021, Sykes and some of his co-workers submitted an anonymous complaint to Cornell about Rachmuth's behavior saying, among other things, that she "[l]eads and makes decisions with extreme bias," "[d]isplays an affinity and preferential treatment towards staff who identify as white/white passing," and has shown "[c]ountless times that she is not an ally, but in fact, doubles down on white supremacist behavior." *Id.* ¶¶ 74-75 (emphases omitted).  Three weeks after receiving the complaint, an investigator interviewed Sykes, who admitted to being one of the drafters of that complaint. *Id.* ¶ 78.  Sykes then "formally identified himself in writing as one of the authors of the complaint of racial discrimination." *Id.* ¶ 79.  Around the same time, another employee complained about Rachmuth's behavior and was terminated by Rachmuth on the basis that she had "performance issues," a claim Sykes describes as baseless, and was "on probation." *Id.* ¶¶ 80-81.  Cornell conducted an investigation but ultimately took no action on the basis of the report. *Id.* ¶¶ 76-85.  Sykes resigned on June 29, 2022, citing retaliation for reporting sexual harassment from Nathanson and bias from leadership. *Id.* ¶ 87; Exh. B.

**B.      Procedural History**

Sykes initiated this action on May 16, 2022.  Dkt. 1.  He filed an Amended Complaint on June 10, 2022, Dkt. 5, in order to fix a typographical error in a party's name, Dkt. 4.  After the Court granted Defendants leave to file a motion to dismiss based on a pre-motion letter, Dkt. 21, Sykes filed a Second Amended Complaint on August 10, 2022, Dkt. 25, bringing claims for discrimination under 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL, as well as for retaliation under the NYSHRL and the NYCHRL, *id.* ¶¶ 88-112.  Defendants moved to dismiss on August 17, 2022, Dkts. 33-35.  Sykes opposed the motion on September 19, 2022, Dkts. 37-38.  Defendants filed a reply on October 4, 2022.  Dkt. 39.

## II.  Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009) (citation omitted).

## III.  Discussion

### A.      Section 1981 Claim

Sykes's sole federal claim alleges "Racial Discrimination in Violation of 42 U.S.C. § 1981."  Second Am. Compl. ¶¶ 88-92.[3]  Specifically, Sykes alleges that Defendants violated section 1981 "by making material decisions regarding [Sykes's] employment, such as limiting the scope of [Sykes's] job responsibilities and powers based on [Sykes's] race, and treating [Sykes] less favorably than similarly situated senior Caucasian employees, which resulted in [Sykes's] being treated less favorably based upon [his] race."  *Id.* ¶ 90.

### 1.      Race Discrimination Claim

Section 1981 provides, in relevant part, that "[a]ll persons . . . shall have the same right in every State and Territory to . . . the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  Thus, to establish a claim under section 1981, a plaintiff must show (1) that the plaintiff is a member of a racial minority, (2) the defendant's "intent to discriminate on the basis of race," and (3) "discrimination concerning one of the statute's enumerated activities."  *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000).[4]  The enumerated activities include the rights "to make and

---

[3] While Sykes refers to a section 1981 claim for retaliation in his briefing, *see* Dkt. 37 ("Opposition") at 9-11, the Second Amended Complaint makes no mention of such a claim. Because Sykes explicitly distinguishes his various causes of action under the NYCHRL and the NYSHRL in the Second Amended Complaint, and in doing so specifically alleges retaliation in violation of those statutes, but refers only to a claim for discrimination under section 1981, the Court does not construe the Second Amended Complaint as bringing a claim for retaliation in violation of section 1981.

[4] Given the factual allegations made by Sykes in this case, it is important to emphasize that section 1981 requires showing that a defendant's acts are "*racially* motivated" both because the text's "reference to rights enjoyed by white citizens establishes the racial character of the rights being protected" and because "Section 1981 was intended to combat racial or ethnic discrimination, nothing more."  *Albert v. Carovano*, 851 F.2d 561, 571-72 (2d Cir. 1988) (emphasis added) (internal quotation marks omitted).

enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981(a). Additionally, for an individual to be liable under section 1981 the person must be "personally involved in the alleged deprivation" of rights. *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (quoting *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004)).

By applying to "discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship," section 1981 extends to discrimination in employment. *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004). A claim for employment discrimination under section 1981 is analyzed under the same framework as section 1983 and Title VII. *See Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (analyzing section 1981 claim under same adverse employment action framework as Title VII claim). That framework requires a plaintiff to "alleg[e] facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). The plaintiff must show that "(1) [he] was within the protected class; (2) [he] was qualified for the position; (3) [he] was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Harris v. N.Y.C. Hum. Res. Admin.*, No. 20 Civ. 2011 (JPC), 2021 WL 3855239, at *6 (S.D.N.Y. Aug. 27, 2021) (internal quotation marks omitted). "[D]iscriminatory intent is a necessary element of a § 1981 claim." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 368 (S.D.N.Y. 2006); *Patterson*, 375 F.3d at 226 ("[A] plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional."). And the relevant standard for such discriminatory intent is but-for causation; the plaintiff must show that "defendant's discriminatory intent was a 'but-for' cause

of the adverse employment action or the hostile work environment." *Naumovski v. Norris*, 934 F.3d 200, 213 (2d Cir. 2019) (requiring but-for causation in section 1983 claims because it "has long been a standard prerequisite in § 1983 claims generally"); *Comcast Corp. v. Nat. Assoc. of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (applying the but-for standard to section 1981); *see also Europe v. Equinox Holdings, Inc.*, No. 20 Civ. 7787 (JGK), 2022 WL 4124763, at *5 (S.D.N.Y. Sept. 9, 2022).

To infer discriminatory intent at the motion to dismiss stage, "the question is not whether a plaintiff is likely to prevail, but whether the well-pleaded factual allegations plausibly give rise to an inference of unlawful discrimination, *i.e.*, whether plaintiffs allege enough to 'nudge[] their claims across the line from conceivable to plausible.'" *Vega*, 801 F.3d at 87 (alteration in original) (quoting *Twombly*, 550 U.S. at 570). The plaintiff must have "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311. One method of showing discriminatory intent is to show disparate treatment between plaintiff and a similarly situated employee outside of the protected group. *See Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'— is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000))).

An adverse employment action is one that causes "a materially adverse change in the terms and conditions of employment." *Vega*, 801 F.3d at 85 (internal quotation marks omitted). It must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id*. (internal quotation marks omitted). Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices unique to a particular situation."
*Id.* (internal quotation marks omitted). "Subjecting an employee to unequal pay can, of course, constitute a materially adverse employment action." *Humphries v. City Univ. of N.Y.*, No. 13 Civ. 2641 (PAE), 2013 WL 6196561, at *6 (S.D.N.Y. Nov. 26, 2013) (quoting *Butler v. N.Y. Health & Racquet Club*, 768 F. Supp. 2d 516, 532 (S.D.N.Y. 2011)).

In opposing dismissal, Sykes points to various supposed adverse employment actions. *See* Opposition at 8-9. Several plainly are not actionable. He identifies a series of actions that—putting aside whether they even would constitute adverse employment action—are not alleged with any specifics or are alleged to have been directed at employees other than him. *See id.* at 8 (arguing that Rachmuth would take actions "to devalue Black employees and ensure that they were treated less [sic] than their white counterparts," would "openly scrutinize the work of Black employees when she did not do the same to Whites," and commented on a "Black woman's hair [as] being 'kinky'"). But to trigger a violation of section 1981 for race discrimination, it is Sykes himself who must have suffered a specific adverse employment action.[5]

The only possibly valid adverse employment action identified by Sykes is his receipt of unequal pay. Sykes argues that he was the victim of race discrimination because Defendants paid him "less than his white colleagues" and did not give him a raise of more than 15% despite an Asian colleague, Kim, receiving such a raise. *Id.* at 8-9. To recap, Sykes alleges that he was hired

---

[5] Sykes's opposition brief also contends that "Rachmuth would openly challenge Mr. Sykes['s] verbal report on numerical data by asking him 'if he was sure his numbers were correct.'" Opposition at 8. This allegation is not made in the Amended Complaint, however. Once again, putting aside the question of whether pressing an employee as to the accuracy of his work constitutes an adverse employment action, unsworn statements by counsel in a brief cannot establish an allegation that can overcome a motion to dismiss. *See Journal Pub. Co. v. Am. Home Assurance Co.*, 771 F. Supp. 632, 635 (S.D.N.Y. 1991) ("[I]t is axiomatic that a court may not look beyond the face of the complaint on a motion to dismiss for failure to state a claim.").

for one role at the Center, yet ended up performing another role—though he makes no specific allegations as to the nature of either role.  Second Am. Compl. ¶¶ 57-58.  When Sykes brought these concerns to human resources in early 2021, human resources interviewed him for a different role and eventually offered him a new position with a higher salary, retroactive to the start of that year.  *Id.* ¶¶ 60-64, 66.  Sykes asked human resources for a salary of $60,000, but was denied based on the explanation that a salary increase of more than fifteen percent was not allowed under the Center's policy.  *Id.* ¶¶ 64-65.  Ultimately, Sykes accepted Defendants' offer to increase his salary to $57,000 retractive to January 2021, but explained that he did so because Rachmuth had "made it clear" to him that "his former role would be eliminated" such that he could either accept the new role or "face termination."  *Id.* ¶¶ 65, 68.  Sykes alleges that this new salary reflected a smaller percentage than the raise was received by Kim, who he claims did in fact receive a salary increase of more than fifteen percent after being transferred to a new role.  *Id.* ¶ 69.

Of course, "[s]ubjecting an employee to unequal pay can . . . constitute a materially adverse employment action."  *Humphries*, 2013 WL 6196561, at *6 (internal quotation marks omitted). But "to establish an inference of discrimination based on a showing of disparate treatment, [a plaintiff] must plead that '[he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self.'"  *Id.* (quoting *Graham*, 230 F.3d at 39).  Sykes's allegations fall short of doing so.  Sykes alleges essentially nothing about his own position, other than that his prior position entailed him performing the role of a "data analyst."  Second Am. Compl. ¶ 58.  This absence of any details alone prevents a court from making a meaningful comparison between Sykes and another employee.  But not only that, Sykes also makes no allegations about the job held by his comparator, Kim, the work Kim performed, or Kim's responsibilities at the Center.  Sykes merely alleges that Kim "had been given an increase of more

than 15% in annual compensation, after being transferred to a new role." *Id*. ¶ 69.  Nor does Sykes allege anything about the salary or the job duties of "his white colleagues" who supposedly were paid more according to his opposition brief.  Opposition at 8.[6]  This is insufficient information to raise an inference of discriminatory intent.  *See Daniels v. City of New York*, No. 17 Civ. 9960 (LGS), 2019 WL 251511 at *4 (S.D.N.Y. Jan. 17, 2019) (holding that complaint failed to raise inference of discrimination where it lacked "any specificity as to the alleged comparators' qualifications, responsibilities, employment history and conduct"); *Humphries*, 2013 WL 619651, at *7 (holding that complaint failed to raise inference of race discrimination with respect to unequal pay where it did not plead how long the comparator worked for the employer of "anything about [the comparator's] administrative experience . . . job responsibilities . . . or her annual reviews").

Compounding these fatal pleading deficiencies is that Sykes points to allegedly discriminatory intent only on the part of Rachmuth.  *See* Opposition at 8-9.  But he fails to allege that Rachmuth had any control over setting wages at the Center or played any role in determining the salary that Sykes received.  Instead, Sykes alleges that he was "directed" to a member of human resources "to negotiate his new salary."  Second Am. Compl. ¶ 63; *see also* Opposition at 5 ("Defendants directed Plaintiff to HR to negotiate his new salary.").  Thus, assuming *arguendo* that Sykes adequately pleaded any discriminatory intent on the part of Rachmuth and that he was subject to unequal pay, he has not pleaded that her intent was a but-for cause of his pay rate.  And Sykes makes no allegations suggesting that the human resources employee who negotiated his raise acted with discriminatory intent, pointing only to the flawed comparator analysis discussed *supra*.

---

[6] This allegation too is nowhere to be found in the Second Amended Complaint.

Sykes has therefore failed to allege that he suffered an adverse employment action for which anyone's racially discriminatory intent was a but-for cause, and so the Court grants the motion to dismiss his claim under 42 U.S.C. § 1981 for discrimination.[7]

### 2.    Race-Based Hostile Work Environment Claim

A plaintiff may establish a violation of section 1981 through the creation of a hostile work environment on the basis of his race. *See Patterson*, 375 F.3d at 226 ("[I]ndividuals may be held liable under §§ 1981 and 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment . . . ."); *Rupert v. King*, No. 19 Civ. 2781 (KMK), 2020 WL 5751513, at *6 (S.D.N.Y. Sept. 25, 2020) ("[A] § 1981 plaintiff may allege that discrimination occurred in the form of discrete adverse employment actions, as well as by means of conduct creating a hostile work environment." (internal quotation marks omitted)).

> To state a race-based claim for a hostile work environment, the plaintiff "must plead facts that would tend to show that the complained of conduct:  (1) is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's" race.

*Everett v. N.Y.C. Dep't of Educ.*, No. 21 Civ. 7043 (JPC), 2022 WL 2342693, at *7 (S.D.N.Y. June 29, 2022) (ellipsis in original) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).

"A hostile work environment is created '[w]hen the workplace is permeated with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment."'" *Moore v. DeJoy*, No. 18 Civ. 9967 (JPC), 2021 WL 4523503, at *5 (S.D.N.Y. Sept. 30, 2021) (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  To determine whether an environment is "hostile" or "abusive," a

---

[7] To the extent Sykes seeks to base his claim in his pre-raise pay, he faces the same failure to show discriminatory intent, especially as he does not allege who set that rate of pay.

court considers "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The hostile work environment may result from "a single incident [that] was extraordinarily severe, or . . . a series of incidents [that] were sufficiently continuous and concerted to have altered the conditions of [the plaintiff's] working environment." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted). But "[i]solated incidents or 'episodic' stray remarks are not 'sufficiently continuous and concerted in order to be deemed pervasive.'" *De Figueroa v. New York*, 403 F. Supp. 3d 133, 160-61 (E.D.N.Y. 2019) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

The section of Sykes's brief defending his hostile work environment claim does not mention any specific acts that he contends created a hostile work environment, instead incorporating by reference other sections of his brief. *See* Opposition at 11-12. Yet, from reviewing the allegations in his Second Amended Complaint, Sykes essentially accuses two employees at the Center of engaging in conduct that created a hostile workplace. But even when credited, very little of the conduct alleged pertained to Sykes's race and, combined, the allegations do not amount to a hostile work environment on the basis of his race.

The first employee is Nathanson, who allegedly made sexual advances towards Sykes until learning he was gay, and then began making other "inappropriate comments." Second Am. Compl. ¶¶ 35-37. The vast majority of Nathanson's alleged conduct, however, concerned Sykes's weight or sexual orientation, which are not covered by section 1981. There is only one comment that Nathanson allegedly made that appeared to concern his race: Nathanson allegedly "compar[ed] the size of [Sykes's] genitals to that of an Asian co-worker," which Sykes calls "racially charged."

*Id.* ¶ 37.  This sole comment is not sufficient to allege that Nathanson created an environment "sufficiently continuous and concerted to have altered the conditions" of Sykes's working environment on the basis of his race.  Moreover, Nathanson is not a Defendant in this case, and her conduct cannot be imputed to Cornell for reasons discussed at *infra* III.A.3.[8]

The second employee is Rachmuth, who is a named Defendant.  As to Rachmuth, Sykes has failed to sufficiently allege either discriminatory intent or a severe or pervasive hostile environment.  Various actions allegedly taken by Rachmuth do not appear motivated in any way by racial animus.  Nor are these actions particularly severe.  For instance, Sykes alleges that after he complained about his pay, Rachmuth "grew colder, cancelled their weekly meetings, and began to curtail some of [Sykes's] responsibilities."  Second Am. Compl. ¶¶ 70-71.[9]  Similarly, Sykes complains that during an April 2021 meeting, Rachmuth "disingenuously forced a discussion about the rise in Asian[] hate crimes as a result of the pandemic," and accused Sykes and a biracial employee, Kabemba, of lacking interest in the topic.  *Id.* ¶ 72.  While the subject of Asian hate crime is a race-related topic, the allegation that Rachmuth initiated a discussion about that issue does not reflect any discriminatory conduct *toward Sykes based on his race*, nor does Rachmuth's comment after the meeting that another employee must be "hanging out with Terrel."  *Id.* ¶ 72. *See Alfano*, 294 F.3d at 377 ("It is therefore important in hostile work environment cases to exclude from consideration [conduct lacking] a linkage or correlation to the claimed ground of

---

[8] To be sure, if Nathanson in fact made the comments that Sykes accuses her of making, that conduct would be wholly inappropriate in the workplace.  But even crediting the allegations at this stage, the conduct cannot support a hostile work environment claim *on the basis of race* as required under section 1981.

[9] As discussed *supra*, the Court has determined that Sykes has not alleged sufficiently that any pay disparity was motivated by a discriminatory intent.  Nor does he allege that his internal complaints about his pay accused the Center of paying him less because of his race.  *See* Second Am. Compl. ¶¶ 59-60, 62-63.  He therefore cannot use a connection to that pay disparity to show that Rachmuth's subsequent behavior toward him was racially motivated.

discrimination."); *see also Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117-18 (2d Cir. 2010) (discussing the requirement that facially neutral events be somehow shown to be discriminatory in assessing "totality of the circumstances offered to prove a hostile work environment").  Sykes also claims that Rachmuth directed his "Racial Equity and Justice" group to "lead discussions on race and equity, as well as conduct presentations on the group's accomplishments on race and equity to determine the viability and necessity of the program." Second Am. Compl. ¶¶ 54-55.  Even though Sykes acknowledges that Rachmuth encouraged the group to show its "accomplishments on race and equity," he alleges in conclusory fashion, without any alleged facts in support, that Rachmuth's true goal in having the group present was to diminish or shut down the program.  *Id.* ¶ 55.  Such an unsubstantiated allegation can hardly support a hostile work environment based on Sykes's race.

Sykes also points to several acts by Rachmuth towards others which he seems to argue form part of his hostile work environment claim.  Opposition at 8, 11.  These allegations have more of a racial tone, but are still insufficient to raise an inference that any treatment of *Sykes* was based on his race.  Nor are they severe enough to sufficiently impact Sykes's work environment and make it racially hostile.  A court assesses conduct towards others when examining the work environment as a whole, *see Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001), though such conduct is considered "reduced" in severity, *see Lawrence v. Chemprene, Inc.*, No. 18 Civ. 2537 (CS), 2019 WL 5449844, at *9 (S.D.N.Y. Oct. 24, 2019).  Sykes alleges that Rachmuth altered a reporting structure after Nathanson was fired such that a white employee did not report to Nathanson's replacement who was black.  Second Am. Compl. ¶ 50.  Notably, Sykes does not allege that his reporting was in any way impacted, nor does he allege any facts to suggest that the reporting decision was motivated by race, as opposed to merely resulting in what he views

as a racist outcome, let alone that it created a hostile work environment for him.  Sykes also alleges that Rachmuth would "make inappropriate remarks about the ethnic features of staff, such as advising a Black employee on how to keep her hair from getting kinky," *id.* ¶ 52, and that Rachmuth was "openly critical" of one black employee but not another white employee in the same position, *id.* ¶ 51.  First, the Second Amended Complaint is unclear as to whether Sykes witnessed these events or heard about them later secondhand.  The same is true of allegations that an investigator at Cornell learned of further conduct by Rachmuth after employees raised complaints about her including that she directed a black employee to "quell any feelings of racial animus expressed by other Black employees," gave an Asian employee in an unspecified role "less authority and discretion" than a white employee in a "substantially similar" but also unspecified role, and "accredit[ed] work done by a Black subordinate to a Caucasian supervisor."  *Id.* ¶ 83.  And second, all these allegations lack sufficient factual content for the Court to determine how, or if, the alleged actions were discriminatory and how they may have contributed to any hostile work environment experienced by Sykes.  And to the extent they have any relevance, such allegations as to conduct towards employees other than Sykes "are less supportive of a plaintiff's hostile work environment claim."  *Tringone v. N.Y. State Off. of Mental Health*, No. 18 Civ. 1896 (EK) (ARL), 2021 WL 5324897, at *7 (E.D.N.Y. Nov. 15, 2021).

Finally, Sykes cites the anonymous complaint he and others submitted about Rachmuth, in which they describe her as someone who "[d]isplays an affinity and preferential treatment towards staff who identify as white/white passing" and "doubles down on white supremacist behavior." *Id.* ¶ 75 (emphases removed).  But Sykes provides no facts to support these conclusory allegations, and "[c]onclusory allegations of racial discrimination are insufficient to survive a motion to dismiss" under section 1981.  *Murray ex rel. J.M. v. Lakeland Cent. Sch. Dist. Bd. of Educ.*, No.

16 Civ. 6795 (KMK), 2017 WL 4286658, at *9 (S.D.N.Y. Sept. 26, 2017) (dismissing claim based on "conclusory allegations that [defendants] engaged in discriminatory and retaliatory acts"); *see also Albert*, 851 F.2d at 572 ("naked allegation" that defendants "selectively enforced the college rules against plaintiffs because they are black or Latin is too conclusory to survive a motion to dismiss" under section 1981 (brackets, ellipses, and internal quotation marks omitted)); *Perry v. Sony Music*, 462 F. Supp. 2d 518, 520 (S.D.N.Y. 2006) ("Other than [the] conclusory assertion [that the plaintiff felt discriminated against based on his race], [the plaintiff] provides no further detail manifesting any form of racial animus, discriminatory words, prior incidents or other indications that his race played a role in Sony's decision to dismiss him.").

In short, assessed in their totality, Sykes's allegations do not amount to a "workplace [that] is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Moore*, 2021 WL 4523503, at *5 (quoting *Harris*, 510 U.S. at 21).  A plaintiff must show that a hostile work environment is both objectively and subjectively hostile, *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), and Sykes has failed to allege an environment that a reasonable person would find sufficiently hostile based on race given the lack of severity of these allegations and the conclusory nature of many of his allegations.[10]  *See also Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work

---

[10] The Second Amended Complaint does not bring a cause of action for constructive discharge, yet alleges that "[b]ecause Defendants deliberately created such an intolerable work environment, Mr. Sykes was forced to resign his position on June 29, 2022."  Second Am. Compl. ¶ 87.  "[W]hen an individual has failed to allege a hostile work environment, his constructive discharge claim based on those allegations must also fail."  *Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 427 (S.D.N.Y. 2018).  Thus, to the extent Sykes seeks to bring his section 1981 claim on a constructive discharge theory, that fails as well.

environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." (internal quotation marks omitted)).

### 3.    Employer Liability

Sykes's section 1981 claim against Cornell also fails.  Under section 1981, the standard for an employer's liability turns on whether the primary violator was a supervisory or non-supervisory employee.  *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015).  If the employee is a supervisor, as Rachmuth is alleged to have been, then an employer is "strictly liable" for a "tangible employment action" but can escape liability for non-tangible employment actions by "establishing, as an affirmative defense that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided."  *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).  But as to Nathanson, Sykes merely alleges that her position was "ranked higher" than his and then makes the conclusory assertion that she had "real and apparent authority" over him, without any supporting factual allegations.  Second Am. Compl. ¶ 34.  This is insufficient to allege that Nathanson was "empowered by the employer to take tangible employment actions against the victim," as is required to establish that she was Sykes's supervisor.  *Vance*, 570 U.S. at 424.  For conduct of a non-supervisor, "an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action."  *Wiercinski*, 787 F.3d at 113; *see also Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 658-59 (S.D.N.Y. 2017) (applying this test in the section 1981 context).

For reasons stated above, Sykes has failed to plead race discrimination or a hostile work environment under section 1981 with respect to his work at the Center resulting from the conduct

of Rachmuth and Nathanson.  Nor has he alleged discriminatory conduct by any other Cornell employee.  And even if he had sufficiently pleaded that Nathanson violated his federal rights, Cornell would not face liability for her actions based on the allegations in the Second Amended Complaint.  Sykes alleges that after he informed Cornell and Rachmuth about Nathanson's conduct, she was promptly investigated and fired.  Second Am. Compl. ¶¶ 40-43.  Sykes therefore cannot show that her conduct is imputable to Cornell, as Cornell did not "fail[] to take appropriate remedial action" once it knew of the conduct.  *Wiercinski*, 787 F.3d at 113.

Accordingly, because Sykes has not pleaded any actionable tangible or non-tangible employment action taken by a supervisory employee or any acts of discrimination or a hostile work environment by a non-supervisory employee which Cornell knew or should have known about and failed to take appropriate remedial action, the Court dismisses Sykes's section 1981 claim against Cornell as well.

## B.    State Law Claims

Federal courts should avoid "[n]eedless decisions of state law . . . both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  For that reason, the Supreme Court has emphasized that a district court's discretion to exercise supplemental jurisdiction over related state-law claims "need not be exercised in every case in which it is found to exist." *Id.*  In particular, if "federal claims are dismissed before trial . . . the state claims should be dismissed as well." *Id.*  To be sure, "this statement does not establish a mandatory rule to be applied inflexibly in all cases." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (citation omitted).  Rather, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order

21

to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Id.* at 350. But "in the usual case in which all federal-law claims are eliminated before trial," those factors "will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7. In such cases, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.* at 350 (footnote omitted). Sykes has presented no argument as to why the Court should retain his state law claims if his federal claims were dismissed. *See generally* Opposition. Therefore, the Court declines to exercise supplemental jurisdiction and, having dismissed Sykes's federal claims, dismisses his state claims without prejudice as well.

## C.    Leave to Amend

Lastly, the Court considers whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Sykes has not asked the Court for leave to amend the Amended Complaint. "But even when a party does not ask for leave to amend, the Court may grant leave to amend *sua sponte*." *In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 7992 (JPC), 2022 WL 976269, at *18 (S.D.N.Y. Mar. 31, 2022) (internal quotation marks omitted) (collecting cases). When deciding whether to grant *sua sponte* leave to amend, "courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility." *Morales v. Kimberly-Clark Corp.*, No. 18 Civ. 7401 (NSR), 2020 WL 2766050, at *9 (S.D.N.Y. May 27, 2020). After considering these factors, the Court will grant Sykes leave to amend the Second Amended Complaint in the event he believes he can remedy the pleading deficiencies identified herein. Sykes's first amendment was to fix a typographical error,

and only the second was to address issues identified by Defendants in a pre-motion letter.  Dkts. 4, 21, 25.  Nothing indicates that either amendment was sought in bad faith.  Moreover, with discovery having not yet occurred, this case "is still in its infancy, [so] there would be minimal prejudice to Defendant[s] in permitting Plaintiff to make one final amendment."  *Morales*, 2020 WL 2766050, at *10.  The Court emphasizes, however, that Sykes should amend only if he is able to resolve the pleading deficiencies outlined in this Opinion and Order.

## IV.  Conclusion

For the reasons stated, the Court grants Defendants' motion to dismiss in its entirety.  The Court grants Sykes leave to amend his Second Amended Complaint.  In the event Sykes decides to file another amended complaint, he must file it within thirty days of this Opinion and Order.  If Sykes fails to file another amended complaint within thirty days, and does not show good cause to excuse the failure to do so, the Court will dismiss his claim under 42 U.S.C. § 1981 with prejudice, and the remainder of his claims without prejudice.  The Clerk of Court is respectfully directed to close the motion pending at Docket Number 33.

SO ORDERED.

Dated:  March 31, 2023
         New York, New York

_____
        JOHN P. CRONAN
     United States District Judge